UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENTER FOR CONSTITUTIONAL RIGHTS<br><br>*Plaintiff*,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF DEFENSE; UNITED STATES DEPARTMENT OF STATE; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>*Defendants*. | Civil Case No. 23-cv-7689<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552 *et seq.*, seeking declaratory, injunctive, and other appropriate relief to compel the Defendants, the United States Department of Defense ("DOD"), the United States Department of State ("DOS"), and the United States Department of Homeland Security ("DHS") (collectively, "Defendants"), to produce agency records that have been improperly withheld from Plaintiff, Center for Constitutional Rights ("CCR").

2. Plaintiff seeks to compel production of documents sought in a March 31, 2023 FOIA Request related to the United States' evacuation of thousands of Afghan civilians from Afghanistan during the U.S. withdrawal and the Taliban takeover of that country in August 2021,

who were relocated to and detained at U.S-affiliated or -coordinated processing sites overseas ("third country Sites") while their refugee, humanitarian parole, or other pending applications for entry into the U.S. were, or continue to be, processed and decided.

3. Concerned about reports of questionable, secretive detention determinations; inadequate processes to achieve release from detention facilities; and poor conditions in those facilities, including lack of access to counsel, journalists, or other visitors and inadequate medical care, Plaintiff sought records including policies and data relating to the continued detention of Afghan civilians, including the health and safety conditions of their detention and requested a fee waiver and expedited processing for the Request. *See* Ex. 1, FOIA Request on behalf of CCR, dated March 31, 2023 (hereinafter "the Request").

4. Specifically, the Request sought records relating to, among other things (i) the number and demographic information of the Afghan evacuees detained at these Sites; (ii) policies and procedures used to decide which Afghans would be diverted to these Sites; (iii) policies and procedures used to determine whether and when a detained individual can leave the Sites to enter the United States or be sent elsewhere; and (iv) several categories of records relating to the locations and operations of, and increasingly harsh conditions at, each of these Sites. *See* Ex. 1, 5-8.

5. Plaintiff sought these records because, two years after the U.S. withdrawal from Afghanistan and the ensuing humanitarian and human rights crisis, the public has a compelling need to obtain information regarding Defendants' practices, policies, knowledge of, or role in the continued detention of thousands of Afghan civilians, the processes employed to determine whether and how they will be resettled safely, and the possibility that some of these civilians are being forced to repatriate to Afghanistan. Information about one detention site has been so

concealed, despite concerns about harsh conditions there, that residents have come to call it "Little Guantánamo." Further, the public has a time-sensitive need to obtain accurate and up-to-date information about Defendants' practices, policies, knowledge of, or role in these matters, not only to inform their involvement in advocacy around executive policies on immigration and refugee processing, but to meaningfully participate in ongoing discussions regarding the treatment of Afghan civilians by Defendants DOD, DOS, and DHS, well after the war in Afghanistan has ended.

6. Defendants have unjustifiably failed to produce information requested by Plaintiff. To vindicate the public's statutory right to information about ongoing federal government activity endangering the lives and well-being of thousands of vulnerable Afghan refugees, Plaintiff seeks declaratory, injunctive, and other appropriate relief to compel Defendants to immediately process Plaintiff's Request and release records they have unlawfully withheld.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties under 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1346(a)(2).

8. Venue is proper under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(e) and 1402(a) because Plaintiff CCR resides in this district.

9. Because all three Defendants have failed to comply with the time limits imposed by FOIA, including with regard to administrative appeals, thus constructively denying Plaintiff's FOIA request, Plaintiff has exhausted their administrative remedies. 5 U.S.C. § 552(a)(6)(C)(i). Plaintiffs are therefore entitled to appeal directly to this Court for relief. 5 U.S.C. § 552(a)(4)(B).

## PARTIES

10.     Plaintiff CCR is a non-profit, public interest legal and advocacy organization that engages in the fields of civil and international human rights. CCR's diverse issue areas include litigation and advocacy around refugee policy and immigration, as well as racial and ethnic profiling. CCR operates its own Open Records Project, which regularly files FOIA requests in support of community partners and makes documents freely available to the public. CCR staff members often serve as sources for journalists and media outlets, including on issues related to civil and human rights, racial justice and immigrant rights, government misconduct, militarism, and racial discrimination. In addition, CCR regularly issues press releases, has an active social media presence with thousands of followers, and also issues regular email updates sent to over 50,000 supporters about developments and news pertaining to CCR's work. The office and principal place of business of CCR is located in New York County, New York.

11.     Defendant DOD, the largest government agency, is a Department of the Executive Branch of the United States Government and oversees the United States' military force. Its component offices include United States Central Command ("CentCom"), which "directs and enables military operations and activities,"[1] covering 21 nations across Northeast Africa, the Middle East, and Central and South Asia, including Afghanistan, and Department of the Army, which "conducts both operational and institutional missions."[2] Many key components within DOD were highlighted in Plaintiff's FOIA Request, in addition to DOD components CentCom and Army, to which DOD also referred Plaintiff's Request.

---

[1]     U.S. Central Command, *About US*, https://www.centcom.mil/ABOUT-US/ (last visited Aug. 27, 2023).
[2]     U.S. Dep't of Army, *Organization*, https://www.army.mil/organization/ (last visited Aug. 27, 2023).

12. Defendant DOS is a Department of the Executive Branch of the United States Government, and its Office of the Coordinator for Afghan Relocation Efforts ("CARE") "handles the planning and logistics of relocating eligible Afghans on flights or by ground transportation to overseas case processing sites" and "manages those case processing sites in third countries," working with "partners abroad," among others.[3] CARE is among the components of Defendant DOS Plaintiff detailed in its FOIA Request.

13. Defendant DHS is a Department of the Executive Branch of the United States and oversees the entry and exit of all persons into the United States. DHS's offices and components include DHS's Office of the Secretary, Operational Allies Welcome, and the U.S. Citizenship & Immigration Services ("USCIS"), as well as others outlined in Plaintiff's FOIA Request.

14. Defendants are "agencies" within the meaning of 5 § U.S.C. 552(f)(1).

**STATEMENT OF FACTS**

15. All statements herein are made upon information and belief except where basis of knowledge is specified.

**I.    The Dangerous, Uncertain, and Largely Unknown Conditions of Afghans in U.S. Detention**

   **A. The Evacuation and Subsequent Detention of Afghan Civilians in U.S.-Affiliated Sites**

16. Following the August 2021 takeover of Afghanistan by the Taliban and the end of the nearly two decades-long war and occupation by the United States, over 124,000 Afghan civilians were evacuated. Many evacuees faced the threat of being kidnapped, disappeared, or murdered by Taliban forces because of their status as women's rights activists, journalists, protestors, or their association with the U.S. or former Afghan governments.

---

[3]   U.S. Dep't of State, *Afghanistan Inquiries*, https://www.state.gov/afghanistan-inquiries/ (last visited Aug. 28, 2023).

17. Evacuees were sent to several processing Sites around the world where they were held, medically screened, vetted for "security purposes" and processed in order to receive visas or parole into the United States. For thousands of evacuees, this process never ended and they remain stranded in these Sites. Some have reportedly been repatriated back to Afghanistan, where they would face grave danger.

18. Other than limited reporting from humanitarian organizations and some journalists, little is known about the policies governing these Sites or the conditions therein. What has been discovered suggests that the United States and its partners have enacted arbitrary, contradictory, and dangerous procedures, resulting in thousands of evacuees languishing in Sites characterized by deteriorating conditions.

19. The United States has obfuscated efforts to learn more about its role in the operation of these Sites. For example, in a March 2023 letter to Human Rights Watch, CARE denied any involvement on the part of the U.S. government in maintaining Emirates Humanitarian City ("EHC") in Abu Dhabi, stating that "Emirati officials solely manage, control and operate the EHC."[4] This, however, is contrary to reports that U.S. officials visit Sites, on average, twice a week,[5] and Defendant DOS's February 2023 acknowledgement that the U.S. government is working closely with UAE partners to address concerns with EHC. The United States has a role in negotiating, initiating, coordinating, or otherwise has knowledge of these Sites and Plaintiff and the public have a statutory right to information about their government's activities in them.

---

[4] Human Rights Watch, *UAE: Arbitrarily Detained Afghans Stuck in Limbo* (March 15, 2023), https://www.hrw.org/news/2023/03/15/uae-arbitrarily-detained-afghans-stuck-limbo.

[5] Haley Britzky, *Thousands of Afghans escaped the Taliban with the help of private veteran groups. Today, many remain in limbo, held in a compound in the UAE*, CNN (May 7, 2023), https://edition.cnn.com/2023/05/07/politics/afghan-evacuees-stuck-uae-private-evacuation/index.html.

20.     To date, the United States has failed to address the reported inhumane conditions or to provide Plaintiff or the public, including stakeholders, advocates, community members, or human and civil rights organizations with the information necessary to address what by all accounts is a humanitarian and human rights crisis. Plaintiff's Request seeks to rectify this information deficit.

### B. Concerns Abound for U.S. Detention Practices of Evacuees

21.     In its advocacy on behalf of Afghan refugees in EHC, Human Rights Watch has called out the utter lack of transparency around the operation of these Sites and has called on the U.S. government to ensure that due process is respected and humane conditions are maintained.[6]

22.     Little to no public information exists regarding Defendants' methodology for identifying who they will detain or their rationale for why such detention is necessary. There is merely sparse reporting about vague "security flags" contributing to at least the continued detention of a portion of the population. Nor is there information available about what, if any, "fair and individualized processes" exist for those detained to "assess[] their legal status and protection needs."[7] Other reports indicate inconsistent, disparate, and misleading practices and policies.[8]

---

[6] Human Rights Watch, *supra* note 4.

[7] *Id.*

[8] For example, as recently as June 2023, reports found that more than 3,200 evacuated Afghan civilians remain in Albania, nearly two years after their arrival, and are subjected to inconsistent, disparate, confusing, illusive, and arbitrary processes. Civil society organizations continue to be confused and lack important information regarding the situation of these Afghan civilians. Llazar Semini, *After escaping the Taliban, hundreds of Afghans languish in Albania in a prolonged US visa process*, Associated Press (June 18, 2023), https://apnews.com/article/albania-afghans-us-visa-process-wait-9d10f8cd031ac8150727a2ac433d7689. *See generally* U.S. Committee for Refugees and Immigrants, Domestic and International Intermediary Sites in Operation Allies Welcome Phase I and II: National Conference Center, Save Havens, and Lily-Pads (June 2022), available at https://refugees.org/wp-content/uploads/2022/06/Domestic-and-International-Intermediary-Sites-in-OAW-Phase-I-and-II.fnl_.pdf. Further, reports identified Rhine Ordnance Barracks and U.S.-controlled Ramstein Air Base in Germany as other Sites Afghan evacuees have been held at Ramstein Air Base, *Ramstein completes role in historic humanitarian airlift* (Nov. 2, 2021), available at https://www.ramstein.af.mil/News/Article-Display/Article/2829699/ramstein-completes-role-in-historic-humanitarian-airlift/.

23. The lack of information about how individuals were selected for continued detention at these Sites raises especially acute concerns about due process violations and discriminatory treatment of a predominantly Muslim population that has pervaded U.S. policy since 9/11. The United States has long defined security concerns in ways that narrowly cohere with real or perceived Muslim identity along its borders and sphere of influence. Among many other examples, this has resulted in policies like the Muslim and African Bans[9] which continue to keep people out of the United States based on nothing more than their Muslim identity. The failure to provide any information about how these evacuees came to be at the Sites for so long raises important questions about whether similar identity-based "security concerns" are also at play here, which Plaintiff and the public have an interest in understanding.

24. The scarcity of information about U.S. practices also raises pressing questions about changing policies with significant impacts on the well-being of Afghan refugees. For example, in Abu Dhabi, "Afghans who were evacuated to the UAE before Aug[ust] 31, 2021, were effectively guaranteed permission to enter the U.S. if they passed certain medical and security checks."[10] It was reported that those Afghan nationals evacuated before the August 31, 2023 U.S. withdrawal deadline were predominantly those associated with the United States in some way, while, anyone who arrived in the UAE after this deadline, rather than be granted the same humanitarian relief as those who came before, were required to prove qualification for a U.S.

---

[9] The Muslim and African Bans refer to a series of executive actions by the Trump Administration preventing nationals from certain countries from entering the United States. Executive Order 13780, 82 Fed. Reg. 13209 (Mar. 6, 2017), applied to Iran, Libya, Somalia, Sudan, Syria, and Yemen. Proclamation 9645, 82 Fed. Reg. 45161 (Sept. 24, 2017), added Chad, North Korea, and Venezuela and removed Sudan. Chad was removed by Proclamation 9723 on April 10, 2018. Finally, Proclamation 9983, 85 Fed. Reg. 6699 (Jan. 31, 2020), kept the existing list intact and added Burma (Myanmar), Eritrea, Kyrgyzstan, Nigeria, Sudan (again) and Tanzania.
[10] Camilo Montoya-Galvez, *6,500 Afghans evacuated to UAE still stuck in limbo awaiting U.S. resettlement*, CBS News (Aug. 9, 2022), https://www.cbsnews.com/news/afghanistan-refugees-united-arab-emirates-us-resettlement/.

immigration benefit.[11] In other words, individuals diverted to Abu Dhabi's EHC since the withdrawal, based on an unknown process, are now subjected to an exit process that predictably results in a much longer detention that has already stretched on for years with no end in sight. The reasons for policy changes like this demand a full account.

25. Furthermore, there are reports that evacuees are sent to Kosovo's Camp Liya "from other transit locations in Europe and the Middle East"[12] for further "security vetting," causing concern among evacuees about being stigmatized and facing further legal uncertainty. If this is correct, the question follows whether Camp Liya functions for Defendants as a location for more intensive "security vetting" than is conducted at the other Sites to which evacuees are sent. If Camp Liya is governed by processes that are indeed different from the other Sites, the public and those who advocate for the rights of Afghan evacuees are entitled to understand such a critical fact, the different mechanisms by which individuals are diverted to and from, and the stated reasons for any such differential treatment.

26. For two years, the U.S. government has failed to provide adequate information or clarity to civil society organizations, community members, and stakeholders as to the process and conditions Afghan civilians are being subjected to. What little reporting exists suggests that these processes may be rife with the arbitrary and discriminatory actions that characterize much of the United States' engagement with Muslims at its extended border.

**C. Humanitarian and Human Rights Concerns with Site Conditions**

27. In addition to reports about illusive and seemingly arbitrary policies governing these Sites, there have also been indications that the conditions at the Sites specified in the Request,

---

[11] *Id.*
[12] Kyle Atwood & Jennifer Hansler, *US considering returning some evacuees who don't pass vetting process to Afghanistan*, CNN (Nov. 18, 2021), https://www.cnn.com/2021/11/18/politics/camp-bondsteel-afghans/index.html.

and possibly beyond,[13] are deteriorating, giving rise to serious humanitarian and human rights concerns.

*UAE: Emirates Humanitarian City ("EHC")*

28. In March 2023, Human Rights Watch released a report after interviewing sixteen evacuated Afghan civilians who have remained at EHC for over a year. According to these accounts, thousands of Afghan civilians have remained detained for over a year.

29. More specifically, as of the date of Plaintiff's Request, between 2,400 and 2,700 Afghan civilians have been detained at the EHC Site for more than fourteen months.

30. Since their arrival to EHC, Afghan civilians have been subjected to inadequate medical and psychological care; denial of access to United States or UAE government officials, counsel, journalists, organizations, or other visitors, including family; and restrictions on freedom of movement.

31. Afghan evacuees at EHC have said that the process has been carried out "unfairly and slowly,"[14] contributing to a widespread mental health crisis, including severe depression among adults and children alike.[15] Additionally, there have been reports of sexual assault and rape, as well as inadequate reproductive health care resulting in "miscarriages and life-threatening pregnancy complications."[16]

---

[13] Afghans are being held at Sites mentioned in Plaintiff's FOIA request as well as at additional Sites elsewhere. *See supra* note 8.
[14] AMU TV, *Afghan refugees in UAE camp protest over uncertain future* (Jan. 28, 2023), https://amu.tv/33971/.
[15] Human Rights Watch, *supra* note 4.
[16] Global Detention Project & Migrant-rights.org, *"THIS IS A SLOW DEATH": An Urgent Appeal on the Plight of Afghan Refugees Indefinitely and Arbitrarily Detained in the UAE (*March 13, 2023), https://www.globaldetentionproject.org/urgent-appeal-plight-of-afghan-refugees-indefinitely-and-arbitrarily-detained-in-uae.

*Kosovo: Camp Liya*

32. In Kosovo, Afghan civilians are held in Camp Liya, an enclosure within the U.S. Base Camp Bondsteel controlled by Defendants DOS and DOD. At the end of 2022, there were at least thirty-nine Afghans in Camp Liya, with a number facing uncertainty about whether they would remain in Kosovo after being denied entry into the United States.[17]

33. If Afghan refugees leave Camp Liya, they are considered disqualified from seeking humanitarian parole in the United States, leaving them constructively confined within the Camp.[18]

34. Limited reporting indicates deteriorating conditions, with residents of the Camp calling it "Little Guantánamo" due to the lack of information about their cases and austere living conditions.[19] Evacuees have even staged a protest over reported plans to "forcibly" relocate them and to highlight the suffering of the women and children being held at the Camp.[20]

*Qatar: Camp As Sayliyah*

35. Afghan civilians sent to Doha, Qatar, have been held in Camp As Sayliyah ("CAS"), a former U.S. army base. Little information has been made publicly available about the number of people detained at CAS. The facilities at the Camp were expanded in 2021, but the conditions have been heavily criticized. Reports indicate that evacuees are being "warehoused in

---

[17] European Commission, *Kosovo 2022 Report*, Dec. 10, 2022, at p. 55, https://neighbourhood-enlargement.ec.europa.eu/system/files/2022-10/Kosovo%20Report%202022.pdf
[18] U.S. Dep't of Defense, Inspector General, *Evaluation of DoD Security and life Support for Afghan Evacuees at Camp Bondsteel* (Oct. 25, 2022), available at https://www.oversight.gov/sites/default/files/oig-reports/DoD/DODIG-2023-008.pdf.
[19] Jessica Donati, *U.S. in Talks with Suriname to Take Afghans Stranded in Kosovo*, Wall Street Journal (Sept. 16, 2022), https://www.wsj.com/articles/u-s-in-talks-with-suriname-to-take-afghans-stranded-in-kosovo-11663329632.
[20] Mike Ludwig, *Stranded Afghans Who Fled the Taliban Say the U.S. Left Them Behind*, TruthOut (Sept. 28, 2021), https://truthout.org/articles/stranded-afghans-who-fled-the-taliban-say-the-us-left-them-behind/; Teri Schultz, *Afghans adrift on US 'lily pad' in Kosovo*, Deutsche Welle (Aug. 28, 2022), https://www.dw.com/en/afghans-adrift-on-us-lily-pad-in-kosovo/a-62942555/.

giant rooms without air-conditioning with few restrooms and shower facilities, and without access to sufficient nourishment or water."[21]

### D.     More Information Is Urgently Needed to Address Concerns

36.     There is a desperate and immediate need for transparency regarding the processes by which detained Afghans are being governed and the conditions to which they are being subjected. Over the last two years, the United States' withdrawal from Afghanistan, and the humanitarian and human rights crises that have followed, have received urgent and widespread attention from domestic and international press, as well as human rights and civil society organizations and the public. However, vanishingly little information has been released by Defendants as to the conditions of these Sites. Access to detainees continues to be restricted, including at times even to counsel and humanitarian organizations.

37.     There is an alarming lack of clarity about, quite simply, what will happen to the detained Afghan civilians. Some have been given the cruel choice between being sent to yet another third country or "repatriating to Taliban-ruled Afghanistan."[22]

38.     Accordingly, Plaintiff's FOIA Request and the present action are necessary in order to vindicate the public's statutory right to be informed about the concerning treatment and legal limbo to which Defendants have subjected Afghan civilians, as well as allow the public, particularly civil society organizations, lawyers, elected representatives, impacted family members, and Afghan communities to adequately respond to and meaningfully engage in the imminent public debates exploring Defendants' responsibilities, and violation of those responsibilities, to Afghan civilians.

---

[21]    U.S. Committee for Refugees and Immigrants, *supra* note 8, at 3.
[22]    Ali M Latif, *Afghan MMA fighter recounts life in UAE resettlement camp*, Middle East Eye (June 10, 2023), https://www.middleeasteye.net/news/afghanistan-uae-mma-fighter-recounts-life-resettlement-camp.

**II.     Plaintiff's Request for Information**

39.    On March 31, 2023, Plaintiff filed its FOIA Request with Defendants DOD, DOS, and DHS via Federal Express.

40.    Plaintiff's Request sought expedited processing under 5 U.S.C. § 552(a)(6)(E). Plaintiff's Request also sought a waiver of applicable fees under 5 U.S.C. § 552(a)(4)(A)(iii). CCR is a non-profit entity with no commercial interest in the records requested, which are crucial to public understanding of Defendants' operations.

**III.    Defendants' Failure to Respond & Constructive Denials**

*Defendant DOD*

41.    On April 3, 2023, Plaintiff's FOIA Request was delivered via Federal Express to DOD and signed for by "T. THEORDORE RANDLE."

42.    On April 17, 2023, Defendant DOD sent an interim response to Plaintiff, denying Plaintiff's request for expedited processing. DOD's response also stated that the agency had forwarded Plaintiff's request to its components CentCom and Army.

43.    On April 26, 2023, DOD CentCom sent an interim response to Plaintiff, denying Plaintiff's request for expedited processing.

44.    On June 21, 2023, Plaintiff appealed Defendant DOD decision to deny expedited processing and its constructive denial of Plaintiff's Request.

45.    On August 14, 2023, 38 business days since Plaintiff's appeal, Defendant DOD issued a response to Plaintiff's administrative appeal, partially granting expedited processing on certain parts of Plaintiff's Request and remanding the Request back to the agency.

46.    To date, Defendant DOD has not made a determination regarding Plaintiff's Request, as required by statute.

47. To date, Plaintiff has received no response from Defendant DOD's component Army or any other component or office of DOD.

*Defendant DOS*

48. On April 3, 2023, Plaintiff's FOIA Request was delivered to DOS via Federal Express and signed for by "A.ALI."

49. To date, Plaintiff has received no acknowledgement or response from Defendant DOS.

*Defendant DHS*

50. On April 3, 2023, Plaintiff's FOIA Request was delivered to DHS via Federal Express and signed for by "L. MARK."

51. To date, Plaintiff has received no acknowledgement or response from Defendant DHS.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Violation of FOIA for Failure to Disclose and Release Records Responsive to Plaintiff's Request**

52. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as repeated and incorporated herein.

53. Defendants improperly refused to conduct a search, or to respond to Plaintiff's Request at all.

54. By failing to disclose and release the requested records, and by failing to conduct timely and adequate searches reasonably calculated to uncover responsive records, Defendants have violated the public's right, advanced by the Plaintiff, to agency records under 5 U.S.C. §§ 552 *et seq.*, and Defendants' corresponding regulations.

## SECOND CLAIM FOR RELIEF

**Defendants Improperly Denied or Have Not Responded to Plaintiff's Request for Expedited Processing**

55. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if repeated and incorporated herein.

56. Defendants DOS and DHS failed to respond to Plaintiff's Request for expedited processing, violating Plaintiff's right to an expedited processing determination within 10 days of receipt of Plaintiff's FOIA Request under 5 U.S.C. § 552(a)(6)(E) and Defendants' own regulations.

## THIRD CLAIM FOR RELIEF

**Failure to Respond to Plaintiff's Request for a Fee Waiver**

57. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if repeated and incorporated herein.

58. Plaintiff requested a fee waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii).

59. Defendants failed to respond to or to non-conditionally grant Plaintiff's requests for fee waivers, thereby denying Plaintiff's right under 5 U.S.C. § 552(a)(4)(A)(iii) and Defendants' own regulations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Order Defendants immediately to make a full, adequate, and expedited search for the requested records;

2. Order Defendants to engage in expedited processing in this action;

3. Enjoin Defendants, upon completion of expedited processing, to disclose the requested records in their entirety and make copies available to Plaintiff no later than ten days after the Court's order;

4. Aware Plaintiff its costs and reasonable attorney's fees incurred in this action as provided by 5 U.S.C. § 552(a)(4)(E); and

5. Grant any other and further relief as this Court may deem just and proper.

Dated: August 30, 2023
New York, NY

Respectfully submitted,

____\s\ Baher Azmy_____
Baher Azmy
Wells Dixon
Sadaf Doost*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6427
bazmy@ccrjustice.org
wdixon@ccrjustice.org
sdoost@ccrjustice.org

\s\ *Naomi Tsu*_____
Naomi Tsu*
Chris Godshall-Bennett*
Muslim Advocates
P.O. Box 34440
Washington, D.C. 20043
(202) 897-2622
naomi@muslimadvocates.org
christopher@muslimadvocates.org

*Application for admission forthcoming